**KERR–McGEE CHEMICAL CORPORATION, Plaintiff,**

v.

**The CITY OF WEST CHICAGO, and Paul Netzel, individually and in his official capacity, Defendants.**

**No. 90 C 1319.**

United States District Court, N.D. Illinois, E.D.

March 15, 1990.

Thomas P. Healy Jr., Mayer, Brown & Platt, Chicago, Ill., Howard J. Roin, John C. Berghoff Jr., Chicago, Ill., Richard A. Meserve, Peter J. Nickles, Covington & Burling, Washington, D.C., for plaintiff.

Joseph V. Karaganis, James D. Brusslan, Karaganis & White, Ltd. Chicago, Ill., for defendants.

Douglas J. Rathe, Attorney General's Office, Chicago, Ill., amicus curiae for the People of the State of Ill.

---

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

On March 7, 1990 plaintiff Kerr–McGee Chemical Corporation ("Kerr–McGee") filed its Verified Complaint for Declaratory and Injunctive Relief in this case. One day later Kerr–McGee moved for a temporary restraining order ("TRO") and for a preliminary injunction—the motions at issue here.

### I. BACKGROUND FACTS

This dispute involves Kerr–McGee's West Chicago Rare Earths Facility ("facility"), located partially within the corporate limits of the City of West Chicago, Illinois ("City"). (¶ 5.*)

From 1932 to 1973 the facility, which sits on a 43–acre site of land, recovered thorium from "mildly radioactive ores." (¶¶ 8, 10.) As an incident of recovering thorium from the ores, however, the facility produced a sand-like waste material called "tailings." (¶ 10.) Because of concern that these tailings might present a radiation hazard to public health, the U.S. Nuclear Regulatory Commission ("NRC") regulates the disposal of tailings pursuant to U.S. Environmental Protection Agency ("EPA") and NRC standards. (¶¶ 10–12.)

In 1977 the NRC ordered Kerr–McGee to submit a plan for the decommissioning of the West Chicago facility. Kerr–McGee proposed to dispose of the tailings in an earthen structure called an "encapsulation cell" at the facility. (¶ 13; Letter of Tom J. McDaniel, Senior Vice President of Kerr–McGee, dated March 5, 1990 [attached as Exhibit 8 to Plaintiff's Mem. In Support of TRO].) Cell construction would involve placing the tailings on a prepared base and covering them with eight feet of layered clay, rock and soil. (Letter of Tom J. McDaniel, cited *supra*.)

In 1983 an NRC environmental statement concluded that onsite storage of the tailings was appropriate and should be approved. (¶ 14.) The State of Illinois

---

* All unidentified paragraph references are to Kerr–McGee's Verified Complaint for Declaratory and Injunctive Relief.

("State"), however, disagreed. An NRC Atomic Safety and Licensing Board ("ASLB") was convened to resolve the matter. (¶ 15.)

The ASLB asked the NRC staff to consider whether onsite disposal should be authorized and to prepare a supplemental environmental statement. (¶ 16.) Meanwhile, Kerr–McGee prepared and submitted a 12–volume Engineering Report detailing the construction of the proposed disposal cell and its long-term performance. Among other things the Engineering Report analyzed erosion control for the encapsulation cell, described the methods for constructing the cell, and detailed the method of excavation at the site. (¶ 17; Engineering Report, Volume I, "Overview of the Engineering Report," sections 1.3.5, 1.3.8, and 1.3.9 which summarize Volumes VI, IX and X respectively).

In its supplemental environmental statement the NRC staff again recommended approval of the onsite disposal cell. (¶ 18.) The State, however, again argued against approval of onsite disposal of the tailings. (¶ 19.) On February 13, 1989, after a hearing, the ASLB issued an initial decision concluding that Kerr–McGee's proposed disposal cell satisfies regulatory requirements. (¶ 20; NRC Initial Decision at 80 [attached as Exhibit 3 to Plaintiff's Mem. In Support of TRO].) Both the City and the State have appealed the ASLB decision and have filed a motion for a stay, which has been denied. (¶ 22; Plaintiff's Reply, Exhibit 1.)

On February 23, 1990 the NRC staff issued a license amendment. (¶ 21.) The license amendment specifically required that onsite disposal of the tailings "proceed in accordance with the statements and representations contained in [Kerr–McGee's] Engineering Report, Vols. IV, VI, VII, IX and X." (NRC Materials License at ¶ 9 [attached as Exhibit 4 to Plaintiff's Mem. in Support of TRO].)

On March 9, 1990, at a hearing on its motions for injunctive relief, counsel for Kerr–McGee provided this court with only Volume I of the Engineering Report, which summarizes and provides an overview of the other volumes of the report. Because counsel for Kerr–McGee did not provide Volumes IV, VI, VII, IX and X of the Engineering Report, which the court deems highly relevant to the motions under consideration, the court entered an order on March 12, 1990 requesting the submission of those volumes. A review of the contents of those volumes is necessary for an understanding of the issue presented here.

Volume IV of the Engineering Report is entitled "Cell Engineering" and describes the components of the encapsulation cell and their design criteria and configuration.

Volume VI is designated "Erosion Control" and describes the methods and considerations for erosion and sediment control both during construction of the disposal cell and throughout the life of the cell. At page VI–2 under the heading "1. Control of sedimentation during construction," Volume VI states:

> The cell construction plan *provides for compliance with sedimentation control regulations administered for all local construction projects by the City of West Chicago.* The City's regulations set forth in "Procedures and Standards for Urban Soil Erosion and Sedimentation Control in Illinois" (1981), establish conventional guidelines for the management of sedimentation in a heavy construction project. Kerr–McGee has selected design criteria for sediment and erosion control during cell construction that *in all cases meet or exceed the City's "Procedures and Standards" document.* (emphasis added.)

On page 6–2, in a discussion of the criteria applicable to the control of erosion and sedimentation during construction, Volume VI goes on to state:

> 6.1.1.3 *Local Criteria.*
>
> Local criteria *applicable to the disposal site are codified in the City of West Chicago Pollution Control Ordinance.* Typical local practice is described in "Procedures and Standards for Urban Soil Erosion and Sedimentation Control in Illinois," prepared by the Northeastern Illinois Soil Erosion and Sedimentation Control Steering Committee, dated

October, 1981. The West Chicago ordinance and the "Procedures" require active erosion and sediment control through constructive planning, soil stabilization, and sediment control ponds.

6.1.1.4 *Selected Criteria and Rationale.*

Kerr–McGee has selected design criteria for sediment and erosion control during the construction of the disposal cell that *meets or exceeds the requirements of the City of West Chicago ordinance,* and conforms to good construction practice. The criteria to be followed are:

1. control erosion and sedimentation on the construction site to the extent practicable to minimize construction delays

2. control the movement of sediment off-site to levels near pre-construction levels, and in any case, to levels below which will be harmful to the downstream aquatic environment

3. prevent the movement off-site of sediment containing tailings or other wastes from the construction site in levels exceeding those established in 10 CFR Part 20, Appendix B

4. provide a sediment and runoff detention basin that *complies with the City of West Chicago ordinance.*

(emphasis added.)

Additionally, in a section summarizing erosion and sediment control criteria applicable after construction, Volume VI states at pages 6–4 and 6–5:

6.1.2.3 *Local Criteria*

Local criteria *applicable to the disposal site are codified in the City of West Chicago Pollution Control Ordinance.* Typical local practice is described in "Procedures and Standards for Urban Soil Erosion and Sedimentation Control in Illinois," prepared by the Northeastern Illinois Soil Erosion and Sedimentation Control Steering Committee, dated October, 1981. *The West Chicago ordinance requires runoff control to prevent increases in downstream flooding.*

6.1.2.4. *Selected Criteria and Rationale.*

Kerr–McGee has selected criteria for cell design that provides a stable disposal cell and requires a minimum of maintenance. The criteria which Kerr–McGee has selected are:

1. to provide a disposal cell and ancillary features that are stable and have a calculated life in excess of 1000 years

2. to provide a disposal cell that requires a minimum of maintenance

3. to establish a vegetation regime at the facility that is compatible with the climate and environment of the site area, and that will allow for cell stability during the vegetation succession that will occur at the site

4. to provide secondary erosion control features that will limit the deterioration of the cell by unanticipated erosion

5. to conform with all regulatory design mandates as described above.

Adherence to these criteria will satisfy *all applicable regulatory criteria* and protect the surrounding environment and human health in the site vicinity. (emphasis added.)

In yet another section, discussing control of erosion and sedimentation during construction, Volume VI states at page 6–7:

The objective of the construction phase of the Site Water Drainage Control plan is to manage on-site and off-site storm water during construction. Potentially contaminated storm water is managed in accordance with release criteria specified in 10 CFR Part 20, Appendix B, and 40 CFR Part 192. *Sediment control and flood abatement are achieved in accordance with the City of West Chicago Pollution Control Ordinance.*

\*　　\*　　\*　　\*　　\*　　\*

Water from other areas of the site will be directed through a system of temporary and permanent berms and ditches to a detention and sedimentation pond located at the southwest corner of the Disposal Site. This pond will provide a controlled release rate of storm water from the site, and will provide an opportunity for sediment in the storm water to settle from the water before release. This

pond is designed *according to criteria prescribed by the City of West Chicago Pollution Control Ordinance.* (emphasis added.)

Volume IX of the Engineering Report, entitled "Construction," states at page 9–1:

Management of clean and potentially contaminated runoff will be one of the earliest activities to begin during construction of the disposal cell. Control systems will be established for storm water runoff during and after construction of the cell. These systems *conform to criteria supplied by the City of West Chicago Pollution Control Ordinance,* 10 CFR 40 Appendix A, and 40 CFR 192. (emphasis added.)

With regard to the design criteria of storm water control during construction, Volume IX states at page 9–13:

9.5.6. DESIGN CRITERIA

Storm water control facilities *will conform to The City of West Chicago Pollution Control Ordinance,* which includes the following requirements.

The release rate to the storm sewer system shall not exceed 0.15 inches per hour from the contributing area.

Design for storm water detention shall be calculated on the basis of runoff from a 100–year return frequency rainfall.

The combination of storage of the water from a 100–year storm and the design release rate shall not result in a storage duration in excess of 72 hours. Each storm water storage area shall be provided with a method of emergency overflow in the event a storm in excess of the 100–year return frequency storm occurs.

(emphasis added.)

Finally, in section 9.5.6.2, entitled "Disposal Site Detention/Sedimentation Pond," Volume IX states at page 9–15: "The detention pond is sized *to meet the West Chicago Ordinance* after completion of the cell." (emphasis added.) On the next page Volume IX reiterates this point as to the "Factory Site Detention Pond": "The pond is sized to *conform to the requirements of the West Chicago Ordinance.*" (emphasis added.)

Based upon its own Engineering Report and representations made to this court it is undisputed that Kerr–McGee is well aware of the requirements for compliance with the West Chicago Ordinance and regulations. (*See* Kerr–McGee Reply at 6.) Moreover, there can be no dispute that Kerr–McGee repeatedly represented to the NRC by submitting its Engineering Report that it planned to comply with West Chicago's Ordinance and regulations. (*See e.g.,* Vol. VI Kerr–McGee Engineering Report, page VI–2.) Indeed, the NRC amended Kerr–McGee's license on February 23, 1990 based upon the representations and statements in Kerr–McGee's Engineering Report. The amended license explicitly required Kerr–McGee to proceed "in accordance with the statements and representations" in Volumes IV, VI, VII, IX and X—volumes which include Kerr–McGee's representations that its onsite disposal of the tailings would comply with West Chicago's Ordinance and regulations. However, despite its statements to the NRC that construction of the encapsulation cell would comply with West Chicago's Ordinance and despite the NRC's requirement in the February 23, 1990 license amendment that Kerr–McGee act "in accordance" with its own Engineering Reports, Kerr–McGee has not and does not intend to comply with the City's Ordinance.

Because of this failure to comply with the Ordinance, on March 6, 1990 the City's Mayor and a sergeant of its police force informed the facility's manager that any activity at the site other than certain monitoring would be considered a violation of the Ordinance, thereby subjecting persons undertaking such activity to arrest. (¶ 28; Declaration of Mark Krippel at ¶ 3 [attached as Exhibit 13 to Plaintiff's Mem. in Support of TRO].) The City posted legal notices to that effect at the facility. (¶ 29; Affidavit of Mayor Paul Netzel at ¶ 11.) Because of these actions work at the facility stopped. (¶ 30.) Two days later Kerr–McGee filed the motions for injunctive relief now before this court. Both Kerr–McGee's motion for a TRO and its motion

for preliminary injunction seek to enjoin the City and its agents from taking any action to prevent Kerr–McGee from beginning construction of its onsite disposal cell.

On March 9, 1990 this court heard arguments by Kerr–McGee, the City, and the State, which filed a brief as *amicus curiae*. To allow the court time to fully consider the voluminous materials submitted by the parties as well as a reply brief submitted by Kerr–McGee, the court deferred ruling upon Kerr–McGee's motions until today.

## II. DISCUSSION

In determining whether to grant Kerr–McGee's motion for preliminary injunction this court must apply the following methodology:

> Before a preliminary injunction will issue, the movant must show, as a threshold matter, that: (1) they have no adequate remedy at law; (2) they will suffer irreparable harm if the injunction is not granted; and (3) they have *some* likelihood of success on the merits in the sense that their "chances are better than negligible." If the movant can meet this threshold burden, the inquiry then becomes a "sliding scale" analysis of the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits. In particular, and keeping in mind that the public interest may become important in a given case, the "more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor [in order to get the injunction]; the less likely he is to win, the more need it weigh in his favor."

*Thornton v. Barnes*, 890 F.2d 1380, 1384 (7th Cir.1989) (citations omitted; emphasis in original).

### A. *Likelihood of Success on the Merits*

■ Kerr–McGee has not made the minimal initial showing that it has *some* likelihood of success on the merits in the sense that its "chances are better than negligible." *Id.* at 1384, *quoting Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 387 (7th Cir.1984).

Kerr–McGee's verified complaint seeks, in addition to injunctive relief, a declaration that the Ordinance as applied is preempted by the Atomic Energy Act of 1954, 42 U.S.C. Section 2011 *et seq.* ("AEA"), which provides for exclusive federal control over the containment and stabilization of "by-product" materials such as the tailings at issue here. (¶ 33; prayer for relief.) Were it not for the fact that the NRC, in fulfilling its obligations "to protect the public health and safety and the environment from radiological and non-radiological hazards" pursuant to 42 U.S.C. § 2114(a)(1), required Kerr–McGee to comply with its representations that its disposal plans would conform to West Chicago's Ordinance and regulations, Kerr–McGee may have a point. But since the NRC's license specifically requires compliance with the volumes of the Engineering Report requiring compliance with West Chicago's Ordinance, Kerr–McGee's preemption argument is irrelevant: Kerr–McGee will not prevail on the merits simply because it has failed to comply with the requirements of its license as amended.

Under 42 U.S.C. Section 2114(a)(1) the NRC has the responsibility to insure that management of any byproduct material such as tailings "is carried out in such manner as—(1) the Commission deems appropriate to the public health and safety...." By requiring Kerr–McGee to comply with certain volumes of its Engineering Report—volumes which represent that the proposed site will comply with the West Chicago Ordinance and regulations—the NRC was fulfilling that responsibility. It is true, as the State notes, that the AEA specifically states:

> Nothing in this section shall be construed to affect the authority of any State or local agency to regulate activities for the purposes other than protection against radiation hazards.

42 U.S.C. § 2021(k). However, the court need not even construe this section: because the NRC by its federal action has required Kerr–McGee's compliance with West Chicago's Ordinance and regulations, this is not a case of state law preemption,

but rather a case of Kerr–McGee's violation of federal law.

Indeed, by alleging in its complaint that "[t]he license amendment specifically requires that onsite stabilization proceed in accord with the detailed plan defined in Kerr–McGee's Engineering Report" (¶ 21), which in turn states that Kerr–McGee will comply with the West Chicago Ordinance and regulations, Kerr–McGee in essence has conceded that it has no likelihood of success on the merits.

West Chicago's Ordinance is not in conflict with the NRC's regulation, but rather is embraced by the federal regulatory scheme. The NRC's amendment of Kerr–McGee's license to require compliance with the Engineering Report, which represents that Kerr–McGee will comply with West Chicago's Ordinance and regulations, is a proper exercise of the NRC's function. Therefore, there is no likelihood that the Ordinance as applied conflicts with federal regulation of radiation hazards so as to be preempted by federal law. On the contrary, Kerr–McGee's compliance with the Ordinance would not conflict with federal law, it would bring it in compliance with federal law as reflected in the NRC's amendment of Kerr–McGee's license.

Thus, unlike *Brown v. Kerr–McGee Chemical Corporation,* 767 F.2d 1234 (7th Cir.1985), there is no conflict between West Chicago's Ordinance and regulations and the NRC regulatory action under the AEA. By requiring compliance by Kerr–McGee with its own Engineering Report, the NRC embraced and incorporated the local regulatory scheme into its federal scheme. No conflict exists—the regulatory schemes are in harmony, acting as the federal scheme in this instance.

Therefore, Kerr–McGee has utterly failed to satisfy even the low initial threshold for a preliminary injunction.

### B. *Adequacy of Legal Remedy*

■ In addition to failing to demonstrate even some likelihood of success on the merits, Kerr–McGee also has failed to establish the next requirement for a preliminary injunction—that it has no adequate remedy at law.

Kerr–McGee first argues that due to the City's actions—including the posting of notices and the threat of arrest should excavation commence—"implementation of Kerr–McGee's plan for the stabilization of the West Chicago Facility has been halted." (Plaintiff's Mem. in Support of TRO at 13.) Second, Kerr–McGee contends that the City has interrupted the ordinary work of the facility's employees, thereby causing the threat that they may have to be laid off. (*Id.*)

Kerr–McGee's first argument is unpersuasive. Kerr–McGee's counsel told this court that Kerr–McGee has yet to begin construction of its onsite disposal cell. (Transcript of Proceedings of March 9, 1990 at 6.) Thus, stabilization of the facility has not been "halted"—it merely cannot proceed. Regardless of this semantic difference, Kerr–McGee has not shown that preserving the status quo by delaying the commencement of construction of the cell until this case can be resolved on the merits will cause any harm which cannot be remedied by money damages.

The adequacy of money damages also reveals the deficiency of Kerr–McGee's second argument—that workers at its facility may have to be laid off. The facility currently employs nine persons, who operate an incinerator that burns organic material. (Declaration of Mark Krippel at ¶ 8 [attached as Exhibit 13 to Plaintiff's Mem. in Support of TRO].) However, any contention that Kerr–McGee may have to lay off these employees demonstrates only that Kerr–McGee may suffer injury from the City's actions—not that *legal* remedies for this injury would be inadequate. Money damages can compensate Kerr–McGee for any costs incurred in either laying-off employees or maintaining employees on the payroll until this dispute is resolved at trial. Moreover, the City has represented to this court that it most likely will not attempt to prohibit Kerr–McGee employees from conducting ordinary activities unrelated to cell excavation at the facility. Accordingly, the threat of employee lay-

offs is speculative at best. (Transcript of Proceedings of March 9, 1990 at 7–8.)

### C. *Irreparable Harm*

 Not only has Kerr–McGee failed to demonstrate that it has a likelihood of success on the merits and failed to show that it has no adequate remedy at law, Kerr–McGee also has not shown that it will suffer irreparable harm if the preliminary injunction is not granted.

To show irreparable harm Kerr–McGee again asserts that all stabilization activities at the facility have been halted and that construction of the disposal cell has been delayed. (Plaintiff's Mem. In Support of TRO at 14.) Kerr–McGee goes on to note that it has a "significant interest in moving forward with onsite stabilization and putting its West Chicago problems behind it." (*Id.*)

These contentions fail to demonstrate, however, that Kerr–McGee will suffer irreparable harm between now and resolution of this dispute on the merits. Kerr–McGee admittedly has negotiated for over a decade for amendment of its license to permit onsite disposal of the radioactive tailings. And undoubtedly Kerr–McGee has expended substantial amounts of time, money, and effort in the process. However, Kerr–McGee easily can wait until the outcome of this case on the merits to be compensated, if appropriate, for any additional expenditures of time, money, and effort incurred because of the City's enforcement of the Ordinance. In this instance further delay alone does not constitute irreparable injury. *Cf. Cox v. City of Chicago,* 868 F.2d 217, 223 (7th Cir.1989).

Thus, because Kerr–McGee has not shown that it will suffer irreparable harm in the interim—that is, "harm that cannot be prevented or fully rectified by the final judgment after trial"—its motion for preliminary injunction must be denied. *Roland Machinery,* 749 F.2d at 386.

### D. *Public Interest*

Finally, the public interest certainly would not be served if this court were to countenance Kerr–McGee's apparent dou-

ble-dealing: first telling the NRC in the Engineering Report that Kerr–McGee would comply with West Chicago's Ordinance and regulations, and then, upon receiving the February 23rd license amendment based upon those representations, asserting to this court that it need not comply with West Chicago's requirements at all. Indeed, Kerr–McGee is acting contrary to both the public interest and the NRC's directive by now refusing to comply with West Chicago's Ordinance and regulations.

### III. CONCLUSION

For the reasons stated in this memorandum opinion and order plaintiff Kerr–McGee's motions for injunctive relief are DENIED.